UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:11-CV-00118

**RANDY HAIGHT,** *et al.*                                                              **PLAINTIFFS**

**v.**

**LaDONNA THOMPSON,** *et al.*                                              **DEFENDANTS**

## MEMORANDUM OPINION

This matter comes before the Court on the Defendants' motion for summary judgment. (Defs.' Mot. Summ. J., Docket Number ("DN") 32.)  The Plaintiffs have responded.  (Pls.' Resp., DN 42.)  The Defendants have replied.  (Defs.' Reply, DN 44.)  Fully briefed, this matter is now ripe for adjudication.  For the following reasons, the Defendants' motion is **GRANTED**.

### I.

Plaintiffs Randy Haight, Robert Foley, Roger Epperson, Vincent Stopher, and Gregory Wilson (collectively referred to hereinafter as "Plaintiffs") are death-row inmates imprisoned at the Kentucky State Penitentiary ("KSP") in Eddyville, Kentucky.  Representing themselves *pro se*, they bring suit against LaDonna Thompson, Commissioner of the Kentucky Department of Corrections ("KDOC"); James Erwin, Director of Operations/Programs for KDOC; Al Parke, Deputy Commissioner of KDOC; Philip Parker, Warden of KSP; Ernest Williams, Deputy Warden of Security of KSP; Alan Brown, Deputy Warden of Programs of KSP; Michael Ray, Unit Administrator of KSP; and Robert ("Rocky") Roberts, Program Director of KSP (collectively referred to hereinafter as "Defendants").

Plaintiffs Haight and Wilson assert that the Defendants violated their right to Free Exercise as protected by the First Amendment as well as the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), by changing prison policy

1

in a way that prohibits them from receiving visits from with the clergy members of their choice.

Plaintiffs Foley, Epperson, and Stopher claim that the Defendants violated their Free Exercise rights and RLUIPA by denying them access to a sweat lodge for use in the practice of Native American religious ceremonies and by not providing certain foods for use in a Native American powwow to be held at the prison.

Finally, Plaintiff Haight alleges that he and others were retaliated against in violation of the First Amendment for filing grievances concerning the above-stated claims.

**A. Facts Concerning Clergy Visits**

The Kentucky Department of Corrections maintains policies and procedures that govern the operation of Kentucky's correctional facilities.  In addition to the correctional policies and procedures ("CPPs"), each facility, like KSP, may create and maintain its own institutional policies and procedures ("IPPs"), which apply specifically to that facility.  To the extent that CPPs and IPPs conflict with one another, CPPs issued by the Kentucky Department of Corrections control over facility-specific policies.  At issue in this case are CPP 16.1 and KSP-specific procedures, IPP 16-01-01 and IPP 23-01-03.  CPP 16.1 and IPP 16-01-01 govern visitation procedures at KSP, while IPP 23-01-03 applies to religious services at the facility. Plaintiffs Haight and Wilson claim that a change in visitation policy violates their Free Exercise rights and RLUIPA because it prohibits them from receiving visits from the clergy member of their choice.

Prior to June 2010, clergy were allowed to visit inmates at KSP pursuant to IPP 16-01-01. (*See* IPP 16-01-01, DN 1-1, pp. 28-37.)  That procedure specifically provided that clergy could make "Special Visits" for "a family death, illness, or similar situation."  (*Id.* at pp. 35-36.)  In practice, however, clergy and their family members, including minor children, were allowed to

visit KSP inmates for any number of reasons, not just those outlined in the policy.  During a review of prison procedures, Defendant Ernest Williams, a deputy warden at KSP, discovered that the visitation policy, as liberally applied to clergy under the "Special Visits" provision, conflicted with CCP 16.1.  (William Aff., DN 32-2, p. 7.)  CPP 16.1 did not contain a "Special Visits" provision similar to IPP 16-01-01.  In fact, subject to certain exceptions, the version of CPP 16.1 applicable at the time of Williams's review provided that "[a]n individual shall not be allowed to visit an inmate unless his name appears on the approved visitation list."  (CCP 16.1, DN 32-1, p. 4.)  That policy also stated that "[a] visitor shall not be placed on more than one (1) inmate [visitation] list[.]"  (*Id.*)  As the policy was applied at KSP, however, clergy were allowed to visit an inmate after receiving approval from the facility, did not have to be on an inmate's approved visitation list, and could visit multiple inmates during a single trip to the prison.  Additionally, their children were sometimes allowed to accompany them even though they were not included on any inmate's visitation list.

Around May 28, 2010, Pastor Ralph Hale wrote to Defendant Rocky Roberts requesting to visit Ralph Baze, a death-row inmate who is not a party to this action.  (*See* Email of May 28, 2010, DN 1-1, p. 6.)  On June 3, 2010, Defendant Williams denied Pastor Hale's request.  (*See* Letter of June 3, 2010, DN 1-1, p. 4.)  Williams denied the request even though he noted that Pastor Hale had "been approved on many occasions[,]" and directed him to "ask the inmate to place [Pastor Hale] on [the inmate's] visitation list."  (*Id.*)  Williams also denied a similar request by Pastor Hale to visit Plaintiff Randy Haight.  (*See* Letter of June 21, 2010, DN 1-1, p. 8.)  These visitation requests were denied because Pastor Hale was not on either inmates' visitation list, and his visit would have violated CPP 16.1 if allowed.  (*See* William Aff., DN 32-2, p. 7.)  Similar to Haight, Plaintiff Gregory Wilson was denied visits from another clergyman, Pastor

3

Gerry Otahal.

Soon after the visits were denied, Plaintiff Haight filed a grievance seeking restoration of clergy visits in accordance with KSP's previous application and interpretation of CCP 16.1 and IPP 16-01-01.  (*See* Grievance Number #10-07-005-G, DN 1-1, p. 1.)  Haight's chief argument – developed in more detail through the grievance process – was that regardless of the terms of CCP 16.1 and IPP 16-01-01, clergy visits were governed by IPP 23-01-03.   Under the heading "Religious Programming," the version of IPP 23-01-03 applicable at the time of Haight's grievance stated, "An inmate visit by a Certified Religious Leader shall be conducted in the visitation area during regular visitation.  The Program Director shall approve this visit after verification of credentials."  (IPP 23-01-03, DN 1-1, p. 42; *see* Grievance Appeal Form, DN 1-1, pp. 48-49.)  This policy did not contain the restrictions set forth in CPP 16.1 and IPP 16-01-01.

While Plaintiff Haight's grievance was pending, Defendant Williams notified Defendant Philip Parker, the Warden at KSP, of the discrepancies and inconsistencies between KDOC and KSP policy.  (Williams Aff., DN 32-2, p. 7.)  Warden Parker then placed Defendant Rocky Roberts, KSP's Program Director, in charge of a committee formed to review visitation policy at KSP.  (*See* Mem. of July 8, 2010, DN 1-1, p. 10.)  Visits with clergy were suspended during the period of the committee's review.   (*Id.*)  According to Defendant James Erwin, the Deputy Commissioner of KDOC and an individual with supervisory capacity over Warden Parker, the decision to suspend clergy visits during the period of review helped ensure safety and security at KSP while a new policy was being formed and implemented.  (*See* Erwin Aff., DN 32-2, p. 3.)

On July 13, 2010, Defendant Roberts issued a memorandum to Ralph Baze and the other death-row inmates explaining the new interpretation and application of KDOC and KSP policy.  (*See* Mem. of July 13, 2010, DN 1-1, p. 12.)  Roberts was clear that "clergy visits will not be

approved as a regularly scheduled visit has been in the past." (*Id.*)  This change was necessary because the policies "do not allow for such visits to occur in the context as previously done." (*Id.*)  For future visits by clergy, Roberts offered two solutions: clergy members could join the volunteer chaplains' program at KSP or a prisoner could list the individual on his visitation list. (*Id.*)  As pointed out by the Plaintiffs, neither of these solutions allowed the same access to clergy as previously granted.  Some clergy members only wanted to visit a select number of inmates and did not want to become volunteer chaplains for the prison as a whole.  Further, and most restrictive, the applicable version of CCP 16.1 restricted a visitor to only one inmate's visitors list.  Thus, if Ralph Baze listed Pastor Hale as his visitor, Pastor Hale could not be placed on Plaintiff Haight's list and would be barred from visiting him.

In addition to reinterpreting IPP 16-01-01 so as to bring it into compliance with CPP 16.1, Defendant Roberts and the policy review committee recommended that the above-quoted language be removed from IPP 23-01-03.  (Roberts Aff., DN 32-2, p. 11.)  This deletion removed the clergy visitation language from IPP 23-01-03 and made it so that all visits to KSP, whether by clergy or others, were governed solely by CCP 16.1 and IPP 16-01-01.

After exhausting KSP's grievance procedures, Plaintiffs Haight and Wilson filed the instant suit alleging that the new interpretation of CPP 16.1 and IPP 16-01-01, and the deletion from IPP 23-01-03, violated their Free Exercise rights and RLUIPA by not granting them access to the clergy member of their choice.  They ask the Court to enjoin the Defendants from implementing the new policy interpretations and also seek money damages for the period in which clergy visits were temporarily suspended.

### B.  Facts Concerning the Sweat Lodge

KSP maintains an "Institutional Religious Center" where members of various faiths may

congregate in order to conduct religious services.  At no time has this facility been used as a sweat lodge for Native American religious ceremonies, and KSP does not maintain any other facility for use as a sweat lodge.  In fact, KSP readily admits that a sweat lodge has never been constructed, used, or made available at the facility.  Plaintiffs Robert Foley, Roger Epperson, and Vincent Stopher, espousing Native American beliefs, claim that access to and use of a sweat lodge is integral to their faith.  Beginning on September 6, 2009, these Plaintiffs requested that KSP construct or otherwise provide a sweat lodge for use in their religious practices.  (Letter of Sept. 6, 2009, DN 1-6, p. 2; Foley Aff., DN 1-5, p. 18.)  Receiving no response to their request, the Plaintiffs filed a grievance on November 12, 2009, requesting a sweat lodge.  (*See* Grievance Number 09-11-018-G, DN 1-6, p. 1.)  The grievance proceeded through the appropriate process at KSP, ultimately resulting in Warden Parker denying the Plaintiffs' request.  (*See* Warden's Review, DN 1-6, p. 8.)  Warden Parker reasoned that the sweat lodge would be denied because KDOC "has not approved . . . a sweat lodge at other prisons, so this would be a first if granted. More to the point, whatever is decided on your grievance would likely set precedent for other prisons in [KDOC]."  (*Id.*)  Warden Parker informed the Plaintiffs that they could appeal his decision "to the Commissioner which will allow a more systemic review, including impacts, of this religious practice in the prison system as a whole."  (*Id.*)

Following Warden Parker's advice, the Plaintiffs appealed to Defendant LaDonna Thompson, the Commissioner of KDOC, on February 1, 2010, seeking approval for and installation of a sweat lodge.  (*See* Grievance Appeal Form, DN 1-6, p. 9.)  On February 25, 2010, Commissioner Thompson responded to the Plaintiffs' appeal.  As to the Plaintiffs' request for a sweat lodge, she stated:

> I have reviewed your grievance.  The Department is reviewing the request of
> inmates on Death Row concerning the use of a sweat lodge to practice their

religion.  A final decision has not been made yet and this issue needs to be investigated further.  A decision on this matter will be rendered in the near future and inmates in this grievance will be notified of the outcome.  No further response necessary.

(Comm'r's Resp., DN 1-6, p. 10.)  Because no response was forthcoming, the Plaintiffs sent Commissioner Thompson a letter on August 2, 2010, inquiring into the status of their grievance. (*See* Letter of Aug. 2, 2010, DN 1-6, p. 11.)  On August 9, 2010, the Plaintiffs received another response indicating that "no final decision has been made[,]" and that "an answer should be forthcoming in the near future."  (Letter of August 9, 2010, DN 1-6, p. 12.)  As of the date the Plaintiffs filed this suit, no response had issued from Commissioner Thompson.

Plaintiffs Foley, Epperson, and Stopher allege that Warden Parker's denial of a sweat lodge at KSP and Commissioner Thompson's continued refusal to respond to or otherwise accommodate their request violates their Free Exercise rights and RLUIPA.  They seek an affirmative injunction and order from this Court requiring KSP to construct a sweat lodge and money damages to compensate for their previous deprivation.

### C.  Facts Concerning Traditional Foods at the Powwow

In exercising their religious beliefs, inmates at KSP are permitted to hold religious ceremonies and other observances.  Plaintiffs Foley, Epperson, Stopher, and other inmates have, on occasion, been permitted to hold a powwow in furtherance of their Native American spiritual beliefs.  A powwow is simply a "day of traditional dancing, speaking, and praying in word, song, and music for all that lives.  The gathering of inmates . . . symbolizes a renewal of unity in the Spirit."  (*See* Excerpt from Federal Bureau of Prison, *Inmate Practices & Beliefs* 14 (2003) (attached hereto as Exhibit 1).)  In filing this suit, the Plaintiffs do not allege that they were prohibited from holding a powwow.  Rather, they claim that KSP officials did not permit them to obtain the foods necessary for a traditional meal that normally accompanies a powwow.  As the

Federal Bureau of Prison's publication on inmate religious practices and beliefs states, "A feast of traditional, familiar foods (such as fry bread, corn pemmican, and buffalo meat) is seen as central to the [powwow]." (*Id.*) Evidence in the record shows that the Plaintiffs were allowed to have "fry bread" at their powwow but that their request for other foods, like buffalo meat, was denied. They claim that not being permitted to have a complete traditional meal in conjunction with their powwow violates their Free Exercise rights and RLUIPA.

## II.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). Mere speculation will not suffice to defeat a motion for summary judgment; "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the

8

parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012).

## III.

### A.  Analysis of Clergy Visits Claim

By reinterpreting and altering KSP's visitation policy, Plaintiffs Haight and Wilson argue that the Defendants violated their Free Exercise rights and RLUIPA.  They seek injunctive relief and money damages under both as a means of correcting these alleged wrongs.

#### 1.  *Injunctive Relief for Clergy Visits under Free Exercise and RLUIPA*

The Plaintiffs ask the Court to enjoin the Defendants from implementing the clergy visitation policy described above.  Specifically, they object to the policy because it requires members of the clergy to be listed on an inmate's visitors list and once appearing on one inmate's visitors list, the clergy are not permitted to visit other inmates and cannot be included on their visitors list.

The Plaintiffs' arguments in favor of injunction are now moot.  Since the filing of this case, the Kentucky Department of Corrections has revised CPP 16.1 in order to resolve the Plaintiffs' objections.  (Thompson Aff., DN 32-2, p. 1; Erwin Aff., DN 1-1, p. 3.)  In particular, revised CPP 16.1 provides that clergy may be placed on more than one inmate's visitors list, and doing so does not take away from the total number of visitors an inmate is permitted to include on his visitors list.  (*See* Kentucky Department of Correction, Revised CCP 16.1, pp. 3-4 (attached hereto as Exhibit 2).)  Accordingly, clergy members may now visit with multiple inmates so long as they are included on the inmates' visitors lists.  (*Id.*)  Additionally, the clergy may visit with multiple inmates during a single trip to KSP so long as the clergy receives prior

approval from the warden.  (*Id.* at p. 4.)  As a result of the revisions to CPP 16.1, the Plaintiffs' claims for injunctive relief under the Free Exercise Clause and RLUIPA have been ameliorated and are now moot.

### 2.  *Money Damages for Clergy Visits Under Fee Exercise and RLUIPA*

The Plaintiffs also seek monetary damages for the period they were denied clergy visits while KSP officials reviewed CPP 16.1 and revised IPP 16-01-01.  Because the availability of monetary damages is evaluated using different standards under the Free Exercise Clause and RLUIPA, the Court considers the monetary causes of action separately.

### a.  Money Damages and Free Exercise

As previously explained by the Court, in a § 1983 claim asserting violations of the First Amendment's Free Exercise Clause, monetary damages may only be recovered from the Defendants in their individual capacities.  (*See* Mem. Op. & Order of Sept. 26, 2011, DN 6, p. 6.)

A prisoner "alleging that the actions of prison officials violate his religious beliefs must show that 'the belief or practice asserted is religious in the person's own scheme of things' and is 'sincerely held.'"  *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Kent v. Johnson*, 821 F.3d 1220, 1224 (6th Cir. 1987)).  The Defendants have not challenged the sincerity of Plaintiffs Haight and Wilson's beliefs.  Nor have the Defendants argued that temporary suspension of clergy visits was not a "substantial burden" on the Plaintiffs' religious exercise.  Accordingly, the Court assumes that the Plaintiffs' beliefs were sincerely held and that temporary suspension of the clergy visits was a substantial burden on the exercise of that belief. As such, the Court is left to determine whether the temporary restriction on their right to visit the clergy of their choosing was "reasonably related to a legitimate penological interest."

In *Turner v. Safley*, 482 U.S. 78, 84 (1987), the Supreme Court held that regulations

infringing on an inmate's constitutional rights are subject to rational basis review.  In other words, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interest." *Id.* at 89.  After establishing rational basis as the standard of review, the Court set forth a four-part test for determining whether a prison's restrictions on a constitutional right, such as Free Exercise, are reasonably related to a legitimate penological interest.  First, "there must be a 'valid rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).  Second, in determining whether a restriction is reasonable, the court must ask "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90.  Third, the court must also consider "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.*  Finally, the Court instructed that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation," but that "[b]y the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." *Id.* (citation omitted).  As the Sixth Circuit has noted, "a trial court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999) (citations omitted).  Rather, "[t]he four *Turner* factors are . . . simply 'relevant' to the ultimate inquiry a court must undertake 'when a prison regulation impinges on inmates' constitutional right': determining whether a prison regulation is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 89)).  For an example of the Supreme Court's application of the *Turner* factors to a Free Exercise case, see *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987).

Applying the *Turner* test to the facts of the present case, the Court finds that the

11

temporary suspension of clergy visits while the Defendants brought KSP visitation policy into compliance with CPP 16.1 was rationally related to a legitimate penological interest. First, KSP temporarily suspended clergy visits because its institutional policy did not comply with the governing policy established by KDOC. Thus, the "valid rational connection" between temporary suspension of clergy visits and the prison's interest was two-fold. Not only were the visits temporarily suspended because they did not comply with policy, but they were also suspended because non-compliance created potential security risks at the prison. As Deputy Commissioner Erwin notes in an affidavit submitted with the Defendants' motion for summary judgment, "Wardens have the responsibility of maintaining the safety and security of their institutions." (Erwin Aff., DN 32-2, p. 3.) By temporarily suspending clergy visits at KSP while the institutional policy was brought into compliance with departmental policy, officials at KSP were merely ensuring the safety and security of the institution. Second, no alternative measures existed that would have continued clergy visits while the KSP visitation policy was revised. While this normally would cut against the reasonableness of a prison regulation, this is not the usual prison regulation case. The Defendants temporarily suspended clergy visits while an improper institutional policy was revised so that it would comply with departmental policy. Temporary suspension of clergy visits as improperly practiced was the only available alternative to KSP officials while they corrected their institutional policy and learned how to understand and apply the departmental policy. This fact also weighs in favor of the fourth *Turner* factor. Finally, the Court must consider any impact that accommodation of the Plaintiffs' Free Exercise rights during the temporary suspension of clergy visits would have had on "guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Temporary suspension of clergy visits impacted both death row inmates, like the Plaintiffs, and

12

the general prison population at KSP.  (Thompson Aff., DN 32-2, p. 1; Parker Aff., DN 32-2, p. 5.)  The suspension was not solely aimed at the Plaintiffs but applied to all inmates at KSP.  Accommodation of the Plaintiffs alone could have fostered resentment among other inmates at KSP and potentially caused unrest and increased security risks.  Furthermore, during the period of suspension, guards at the facility lacked any applicable policy to guide inmate visits with clergy, and accommodation for the Plaintiffs would have merely created additional and unnecessary confusion regarding visitation policies and procedures.

In all, the Court finds that temporary suspension of clergy visits while IPP 16-01-01 was brought into compliance with CPP 16.1 was rationally related to a legitimate penological interest in safety and security and the conservation of prison resources.  As such, temporary suspension of clergy visits did not violate the Plaintiffs' right to Free Exercise.

b.  Money Damages and RLUIPA

The Plaintiffs also allege that temporary suspension of clergy visits was a compensable violation of RLUIPA.  Their argument fails as a matter of law.  In *Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009), the Sixth Circuit held that RLUIPA "does not contain a clear indication that Congress unambiguously conditioned receipt of federal prison funds on a State's consent to suit for monetary damages."  As a result, RLUIPA plaintiffs may not recover monetary damages from defendants in their official capacities.  *See id.* at 799-802.

The *Cardinal* Court did not consider whether money damages were available against defendants in their individual capacities, however, and as noted in *Heard v. Caruso*, 351 F. App'x 1, 13 n.5 (6th Cir. 2009), the Sixth Circuit "has not . . . ruled on whether RLUIPA authorized suits for monetary damages against state officials in their *individual* capacities."  Another court of this district has addressed the issue, however.  *Froman v. Ky. Dep't of Corr.*,

No. 3:08CV-P234-H, 2010 WL 1416682, at *2 (W.D. Ky. Mar. 31, 2010) (Heyburn, J.), followed precedent from several circuits considering the issue and held that "RLUIPA . . . does not authorize a claim for damages against state employees in their individual capacities." Because *Froman* already considered and decided the issue in this district, this Court adopts the reasoning of that case.   Accordingly, the Plaintiffs have failed to state a claim for money damages under RLUIPA because such damages are not recoverable from the Defendants in their official or individual capacities.

### B.  Analysis of Sweat Lodge Claim

Plaintiffs Foley, Epperson, and Stopher argue that KSP's refusal to build a sweat lodge to accommodate their Native American beliefs and KDOC's continued refusal to respond to their grievance on the subject constitutes a violation of their Free Exercise rights and RLUIPA.  They seek an order from this Court directing KSP to build a sweat lodge and money damages as compensation for their prior deprivation.

*1.   Injunctive Relief and Money Damages for a Sweat Lodge under Free Exercise*

The Defendants first argue that neither monetary nor injunctive relief should be granted to the Plaintiffs because they have not proven that their Native American religious beliefs are sincerely held.  *See Flagner*, 241 F.3d at 481.  The Court makes no finding as to the sincerity of the Plaintiffs' religious beliefs.  Assuming the Plaintiffs' beliefs are sincerely held and that prohibition of a sweat lodge is a "substantial burden" on those beliefs, the Court holds that the decision to prohibit the use of a sweat lodge at KSP is "reasonably related to a legitimate penological interest" and is not, therefore, a violation of the Plaintiffs' right of Free Exercise. *Turner*, 482 U.S. at 89.  Application of the four-part *Turner* test to the facts of this case supports this outcome.

Under the *Turner*'s first prong, "there must be a 'valid rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it."  *Id.* (citation omitted).  Here, the Defendants denied Plaintiffs access to a sweat lodge because its use would jeopardize the safety and security of inmates, guards, and others at KSP.  As described in the Defendants' motion, a sweat lodge creates a number of substantial security risks.  As proposed in this case, the steam in the lodge would be created by pouring water over an electric heating element located inside of the lodge.  This heating element would be exposed and readily accessible to inmates in the lodge and could be used to inflict substantial injuries on others.  Additionally, the creation of the steam combined with low-lighting in the lodge would make it difficult for guards to monitor inmates during lodge use.  The Plaintiffs have offered to allow prison officials to place a camera inside of the sweat lodge, but the presence of a camera in a dimly lit and steamy room would not resolve the Defendants' concerns about observation and monitoring during the sweat lodge ceremony.  These concerns are magnified by the fact that the inmates requesting the sweat lodge are death-row inmates with violent criminal pasts who are subject to KSP highest security restrictions.  Accordingly, it is abundantly clear that there is a "valid rational connection" between prohibition of the sweat lodge and safety and security concerns, the legitimate governmental interest put forward to justify the prohibition.

The *Turner* test also directs that a court should consider "whether there are alternative means of exercising the right that remain open to prison inmates" in light of the restriction. *Turner*, 482 U.S. at 90.  If alternative means exist, "courts should be particularly conscious of the 'measure of judicial deference owed to correction officials . . . in gauging the validity of the regulation.'"  *Id.* (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).  A sweat lodge is a combination of a physical location and a religious ceremony that can be experience individually

or in congress.  It is unique to the extent that the heat, steam, and other elements of the ceremony occur in a confined space, and there is likely no readily available alternative or substitute for it. That said, the Plaintiffs can access and use the Institutional Religious Center at KSP for congregational worship and other ceremonies.  While not a perfect substitute for a sweat lodge, the availability of an alternative location for religious practices weighs in favor of the reasonableness of the prohibition on the sweat lodge.

*Turner*'s third prong counsels that the reasonableness of a restriction on a constitutional right in the prison context must be measured by "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  *Id.*  Where "accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correctional officers."  *Id.*  Construction and use of a sweat lodge at KSP will have significant "ripple effects" on the facility and the Kentucky Department of Corrections as a whole.  First, KSP is a facility with limited space and resources.  Creating a sweat lodge will necessarily consume both to the exclusion of other inmates.  Unlike the Institutional Religious Center, which is used by inmates of multiple faiths, a sweat lodge would only be used by and beneficial to inmates adhering to Native American traditions.  Additionally, ceremonies in a sweat lodge can last for several hours.  Prison guards would need to be present throughout any such ceremony, naturally drawing them away from other duties and obligations at KSP.  Second, as noted by the Defendants, sweat lodges are not currently in place at other KDOC correctional facilities.  Implementation of a sweat lodge at KSP would set precedent for the use of a sweat lodge at other KDOC prisons, further diverting the department's limited resources.  The impacts of accommodating the Plaintiffs' request for a sweat lodge weigh in favor of the prohibition's

reasonableness.

*Turner*'s final prong instructs that "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* "But if an inmate can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interest, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 90. Here, the Plaintiffs have not pointed to an alternative that would reasonably accommodate their request for a sweat lodge. As the Defendants argue, the basic elements of a sweat lodge – generation of steam through an electric heating element, high heat, dim lighting, and confined space – cannot be altered or modified without raising the same substantial safety and security risks associated with the sweat lodge as requested. Accordingly, the absence of an alternative weighs in favor of the reasonableness of the prohibition.

In all, the Defendants' prohibition on a sweat lodge at KSP is reasonably related to their legitimate penological interest in safety and security. As a result, the Plaintiffs' causes of action for an injunction against the Defendants in their official and individual capacities and their claim for money damages against the Defendants in their individual capacities fail. Prohibition of the sweat lodge does not violate the Plaintiffs' Free Exercise rights. *See Tart v. Young*, 168 F. Supp. 2d 590, 592-94 (W.D. Va. 2001) (denying prisoner access to a sweat lodge did not violate Free Exercise principles).

### 2. *Injunctive Relief and Money Damages for a Sweat Lodge under RLUIPA*

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to [a prison] . . . unless the government demonstrates that imposition of the burden on that person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling

governmental interest." 42 U.S.C. § 2000cc-1(a). RLUIPA creates a private right of action that may be asserted separate from or in addition to a Free Exercise claim. *See* 42 U.S.C. § 2000cc-2(a); *Sossamon v. Texas*, 131 S. Ct. 1651 (2011). Plaintiffs Foley, Epperson, and Stopher allege that denial of the sweat lodge is a substantial burden on their religious exercise in violation of RLUIPA.

RLUIPA "expands the First Amendment protections accorded prisoners with respect to their religious beliefs." *Hayes v. Tenn.*, 424 F. App'x 546, 554 (6th Cir. 2011). "The strict-scrutiny standard mandated by [42 U.S.C. § 2000cc-1(a)] altered the frame work for evaluating inmates' Free Exercise claims that had prevailed since the [Supreme] Court's decision in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987)." *Cutter v. Wilkinson*, 423 F.3d 579, 583 (6th Cir. 2005) ("*Cutter II*"). To establish a violation of RLUIPA, "[a]n inmate . . . must first produce prima facie evidence demonstrating that his religious exercise was substantially burdened." *Hayes*, 424 F. App'x at 554 (citing 42 U.S.C. § 2000cc-2(b); *Barhite v. Caruso*, 377 F. App'x 508, 511 (6th Cir. 2010)). A restriction or regulation by a prison "will be classified as a substantial burden when that action forced an individual to choose between following the precepts of [his] religion and forfeiting benefits or when the action in question placed substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Barhite*, 377 F. App'x at 511 (brackets original) (quotations omitted). Once a substantial burden has been established, "[t]he government then bears the burden of persuasion that any substantial burden on the inmate's exercise of his religious beliefs was 'in furtherance of a compelling governmental interest' and imposition of the substantial burden on the inmate is 'the least restrictive means of furthering that compelling governmental interest.'" *Hayes*, 424 F. App'x at 555 (quoting 42 U.S.C. §§ 2000cc-2(b), 2000cc-1(a)-(2)). The bottom line difference between a Free Exercise

and a RLUIPA claim is that once a substantial burden is established, RLUIPA "employs a less deferential standard – the least restrictive means of furthering a compelling governmental interest – than the standard applied to religious exercise First Amendment claims, a uniform rule having a reasonable relation to legitimate penological interests." *Id.*

Assuming that the prohibition on a sweat lodge at KSP is as a substantial burden on the Plaintiffs' religious exercise, their cause of action under RLUIPA fails because the prohibition furthers the government's compelling interest in safety and security at a maximum security prison, and even though the prohibition is absolute, it is carried out in the least restrictive means possible. In coming to this conclusion, the Court was guided in substantial part by *Fowler v. Crawford*, 534 F.3d 931 (8th Cir. 2008), a case in which, after examining facts similar to those *sub judice*, the Eighth Circuit held that an absolute prohibition on a sweat lodge did not violate RLUIPA.

In *Fowler*, the plaintiff was serving a life sentence in a maximum security prison operated by the Missouri Department of Corrections. *Id.* at 933. Although he and other adherents to Native American spiritual practices held congregational meetings and practiced their religion in various other ways, Fowler was adamant that he could not properly exercise his religion without access to a sweat lodge. *Id.* He brought suit against state officials under RLUIPA seeking construction of a sweat lodge at the prison. *Id.* Throughout the suit, prison officials did not question the sincerity of Fowler's beliefs nor did they dispute that an absolute prohibition on a sweat lodge substantially burdened the exercise of his religion. *Id.* at 934. Rather, they presented "a myriad of reasons why they believe[d] Fowler's request for a sweat lodge compromise[d] security at [the prison] to an unacceptable degree." *Id.* at 935.

It should be noted that the type of sweat lodge Fowler requested varied from the one

sought by the Plaintiffs in this case.  Fowler wanted access to a traditional sweat lodge where the internal steam was generated by pouring water of rocks that had been heated in a wood fire outside of the lodge.  *Id.* at 934.  It also involved access to items that could be used as dangerous weapons, such as shovels and deer antlers.  *Id.*  Regardless of the type of sweat lodge, however, the safety concerns were the same as those present in this case.  First, the sweat lodge created the "risk of sexual misconduct, physical assault, and drug use, as well as fire and heat related safety concerns."  *Id.* at 935.  Second, the "sweat lodge would consume considerable institutional finance and personnel resources and expend many institutional hours."  *Id.*  Finally, extending the unique privilege of the sweat lodge to "one group of inmates to the exclusion of others [could] create[] a risk of resentment among the inmate population leading to the potential for unrest and disturbance."  *Id.*  And much like the present case, officials determined that installing a security camera in the lodge would not deter inappropriate conduct because "the interior of the lodge was dark and . . . steam from the rocks would fog a security camera's lens."  *Id.* at 936.

In the process of dismissing Fowler's RLUIPA action, the court thoroughly discussed the compelling governmental interests at play as well as whether an absolute prohibition on a sweat lodge could be a "least restrictive means" within the meaning of the statute.  First, the court found that the state's interest in safety and security at a prison "is always compelling."  *Id.* at 939.  In addition to safety and security, the court found "a sweat lodge's drain on prison security manpower over the 6-7 hour duration of the sweat lodge" as well as the consumption of other resources was another compelling interest.  *Id.*  Second, the court found that an absolute prohibition on a sweat lodge was "the least restrictive means by which to further the [prison's] compelling interest in safety and security."  *Id.* at 942.  Relying on the Supreme Court's decision in *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) ("*Cutter I*") the court found that substantial

20

deference is due "to the experience and expertise of prison and jail administrators in construing RLUIPA." *Id.* at 941.  Where prison officials had determined that absolute prohibition of a sweat lodge was the only means of ensuring safety and security at the prison, the court found that this did not violate RLUIPA's least restrictive means test.

Aside from minor factual differences between the type of sweat lodge at issue in *Fowler* and the sweat lodge sought here, the legal and policy analysis in *Fowler* is substantively indistinguishable from the present case.  First, the Defendants have shown that absolute prohibition of the sweat lodge furthers their compelling interest in safety and security at KSP, while preserving resources and allocating them in a way that benefits the whole prison population and not just a select few.  The materials needed for the sweat lodge, like the heating element, could easily become weapons in the inmates' hands.  The lodge would be dimly lit and full of steam, making monitoring and observation exceedingly difficult, and a camera in the lodge would not remedy these problems.  Second, because of the substantial deference due to prison administrators in ensuring safety at the prison, absolute prohibition of the sweat lodge has "presented [the Court] with the unusual situation where the government has satisfied the least restrictive means prong by demonstrating that other less restrictive alternatives are not acceptable to plaintiff . . . ."  *Id.* at 938 (quoting *Hamilton v. Schriro*, 74 F.3d 1545, 1556 (8th Cir. 1996)).

So as to be clear, the Supreme Court in *Cutter I* repeatedly directed that "prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area."  *Cutter I*, 544 U.S. at 725 n.13.  In this case, the Defendants claim that the sweat lodge proposed by the Plaintiffs must be prohibited entirely because it would create safety and security concerns that are too great to accommodate at the prison.  Giving due deference to their statements and the evidence in the record, the Court concludes that the absolute prohibition of a

sweat lodge at KSP is the least restrictive means of furthering KSP's compelling interest in safety and security.  Accordingly, the Defendants have not violated RLUIPA in their individual or official capacities in regards to the requested sweat lodge.

### C.  Analysis of Traditional Foods at the Powwow

Plaintiffs Foley, Epperson, and Stopher assert that their Free Exercise rights and RLUIPA were violated when they were only permitted to have fry bread instead of a traditional meal of buffalo meat and other items in conjunction with their powwow at KSP.  In analyzing the Plaintiffs' other claims in this case, the Court has not considered whether the other restrictions were "substantial burdens" on the Plaintiffs' religious practices.  The Defendants essentially admitted as much and instead argued that the restrictions were either reasonably related to a legitimate penological interest or were carried out in the least restrictive manner possible.  Unlike the other religious practices at issue in this case, the Defendants argue that the Free Exercise Clause and RLUIPA have not been violated because the limitation on the powwow meal is not a "substantial burden" on the Plaintiffs' religious practices.  The Court agrees.

"[W]hen faced with both a Free Exercise claim and a RLUIPA claim, a court must, as a threshold matter, inquire as to whether the prison has placed a 'substantial burden' on the prisoner's ability to practice his religion."  *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 833 (8th Cir. 2009) (citing *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008).  "If the prisoner fails to put forth evidence that his ability to practice his religion has been substantially burdened, then the court need not apply the *Turner* test to the Fee Exercise claim and the strict scrutiny test to the RLUIPA claim."  *Id.*

As stated previously, a restriction or regulation will only rise to the level of "substantial burden 'if it forced an individual to choose between following the precepts of [his] religion and

forfeiting benefits or when the action in question placed substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Hays*, 424 F. App'x at 554-55 (quoting *Barhite*, 377 F. App'x at 511). Stated another way, "[a] governmental practice, decision or regulation imposes a 'substantial burden' on the exercise of religion 'if it truly pressures the adherent to significantly modify his religious behavior and significantly modify his religious beliefs.'" *Horacek v. Wilson*, No. 07-13822, 2009 WL 861248, at *3 (E.D. Mich. Mar. 30, 2009) (quoting *Adkins v. Kaspar*, 393 F.3d 559, 569-70 (5th Cir. 2004)). "[A] substantial burden on religious exercise 'is one that forces adherents of a religion to refrain from religiously motivated conduct, inhibits or constrains conduct or expression that manifests a central tenant of a person's religious beliefs, or compels conduct or expression that is contrary to those beliefs.'" *Civil Liberties for Urban Believers v. City of Chicago*, 343 F.3d 752, 761 (7th Cir. 2003) (quoting *Mack v. O'Leary*, 80 F.3d 1175, 1179 (7th Cir. 1996)).

In the face of the Defendants' motion for summary judgment, the Plaintiffs have not shown that the restrictions on the powwow meal are a "substantial burden" on their religious beliefs. Relying the *Inmate Practices and Beliefs* manual created by the Federal Bureau of Prisons, and substantially adopted by KDOC, the Plaintiffs claim that fry bread, corn pemmican, and buffalo meat are *required* for a powwow meal. The manual states that "a feast of traditional, familiar food (such as fry bread, corn pemmican, and buffalo meat) is seen as central to the [powwow]." (Excerpt from Federal Bureau of Prison, *supra*, at 14.) Nothing in this language mandates that KDOC provide the exact foods listed. Furthermore, it appears that fry bread has been provided for the Plaintiffs at previous powwows. There is no evidence tending to show that denial of the requested powwow foods pressured the Plaintiffs to "modify [their] religious behavior or significantly modify [their] religious beliefs," or caused them to "refrain from

religiously motivated conduct," or compelled them to act "contrary to [their] beliefs."  As such, the Plaintiffs have failed to show how a limited powwow meal is a substantial burden on their religious beliefs.  In the absence of a substantial burden, the Plaintiffs' claims under Free Exercise and RLUIPA fail as a matter of law.

## IV.

Finally, Plaintiff Haight alleges that he and others were retaliated against in violation of the First Amendment for filing prison grievances.  His retaliation claim only relates to the alleged denial of clergy visits at KSP.   As stated in the Plaintiffs' response to the motion for summary judgment, they allege "that [the Defendants] covertly retaliated against them when they challenged and gave voice about the administration of [KPS] denying them Pastoral visitation according to Correctional and Institutional Religious and visiting policy."  (Pls.' Resp., DN 42, p. 21.)  The Plaintiffs have not alleged retaliation for filing prison grievances related to the sweat lodge or the powwow.  As such, the Court only analyzes Haight's retaliation claim as it relates to grievances he filed concerning clergy visits at KSP.

To state a *prima facie* claim for First Amendment retaliation a plaintiff must show three elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two - that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 379, 394 (6th Cir. 1999) (en banc) (plurality opinion) (citations omitted).  "An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf." *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) (citing *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir.1996)).  To the extent that Plaintiff Haight filed a prison

grievance related to the denial of clergy visits, the Court finds that he engaged in conduct protected by the First Amendment.  Haight's retaliation claim fails, however, because he has not shown that an adverse action was taken against him.

An adverse action is one that "would deter a person of ordinary firmness from continuing to engage in [the protected conduct]." *Thaddeus-X*, 175 F.3d at 394.  Neither Plaintiff Haight nor the other Plaintiffs have identified any adverse actions that were taken against them as a result of grievances concerning clergy visits.  They claim that Ralph Baze was "discriminated against" when "they denied [clergy] visitation . . . but then approved it for another inmate . . . ." (Pls.' Resp., DN 42, p. 22.)  Ralph Baze is not a party to this suit, and the Plaintiffs do "not have an independent right to help [Baze] with [his] legal claims." *Thaddeus-X*, 175 F.3d at 395 (citing *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993)).  Accordingly, the Plaintiffs may not maintain a retaliation claim for allegedly adverse actions taken against Ralph Baze.

The Plaintiffs also allege that the Defendants took an adverse action against them by taking twenty-one days to response to their grievances concerning clergy visits.  Although the response time may have taken slightly longer than that prescribed by KSP's grievance policy, nothing in the delay "would deter a person of ordinary from continuing to [file prison grievances]." *Id.* at 394.  In fact, the record shows that the Plaintiffs continued to file other grievances despite the delay in the grievance procedure.  Therefore, the delay simply cannot be described as an "adverse action" against the Plaintiffs.

Having failed to show that the Defendants took an adverse action against the Plaintiffs as a result of their grievances, the Plaintiffs' First Amendment retaliation claim fails as a matter of law.

25

**CONCLUSION**

The Defendants moved the Court for summary judgment on the Plaintiffs' various claims arising under the First Amendment and the Religious Land Use and Institutionalized Persons Act. For all of the foregoing reasons, the Defendants' motion is **GRANTED.**

A separate order shall follow.


cc:

Counsel for Defendants

Plaintiffs

# EXHIBIT 1



**U.S. Department of Justice**
Federal Bureau of Prisons

# Technical
# Reference

| | |
|---|---|
| **OPI:** | CPD |
| **NUMBER:** | T5360.01 |
| **DATE:** | 3/27/2002 |
| **SUBJECT:** | Practical Guidelines for Administration of Inmate Religious Beliefs and Practices |

# Inmate Religious Beliefs and Practices

## PRACTICAL GUIDELINES FOR ADMINISTRATION OF
## INMATE BELIEFS AND PRACTICES

### INTRODUCTION

This Technical Reference Manual (TRM) on Practical Guidelines for
Administration of Inmate Beliefs and Practices has been written
to assist chaplains and administrative personnel to appropriately
facilitate the religious beliefs and practices of inmates within
a correctional environment.

With the complexity of religious issues faced by Bureau chaplains
today and the large number of religions represented in the inmate
population, this Technical Reference Manual will assist chaplains
in implementing the mission of the Chaplaincy Services Branch in
the institutions they serve.  The mission is as follows:

> The mission of the Chaplaincy Services Branch is to
> accommodate the free exercise of religion by providing
> pastoral care to all Federal inmates and facilitate the
> opportunity to pursue individual religious beliefs and
> practices in accordance with the law, Federal regulations
> and Bureau of Prisons policy.  The staff chaplain will
> provide religious worship, education, counseling, spiritual
> direction, support and crisis intervention to accommodate
> the diverse religious needs of inmates.  When appropriate,
> pastoral care and subject matter expertise may be extended
> to staff.

The purposes of this Technical Reference Manual are:

1.   To accommodate the provision of religious worship services
     and programs for the faith groups represented in the inmate
     population of the Bureau of Prisons.
2.   To provide guidance to institution chaplains and
     administrators in making informed decisions concerning
     religious issues which surface regularly so that the needs
     of both the correctional environment and the "free exercise"
     clause of the First Amendment are met.
3.   To encourage consistency of practice Bureau-wide given the
     mission and level of security of the institutions.
4.   To provide enough information about each religion for the
     readers to receive a general understanding of its basic
     tenets.

The Technical Reference Manual must be read in conjunction with
the latest version of **P.S. 5360**, "Religious Beliefs and
Practices," other applicable Program Statements, Operations
Memoranda and specific directives which may be issued as needed.
The suggested recommendations to issues raised in each chapter

follow a "best practices" guide which takes the correctional
environment and the "free exercise" clause of the First Amendment
into account. **Final program decisions rest with the Warden.**

The Technical Reference Manual follows the same outline for each
chapter.  The information is divided into two sections, Tab A and
Tab B.  The practical issues of each religion are placed in the
front of the chapter and are placed behind Tab A.  Tab B includes
the history, theology and recommended resources.  If necessary,
glossary and appendices are attached to the chapters.  The format
for each chapter is as follows:

**Tab (A)**

1.   Religious Practices
     a.   Required Daily Observances
     b.   Required Weekly Observances
     c.   Required Occasional Observances
     d.   Religious Holy Days
2.   Religious Items
     a.   Personal Religious Items
     b.   Congregate Religious Items
3.   Requirements for Membership
     a.   Requirements
     b.   Total Membership
4.   Medical Prohibitions
5.   Dietary Standards
6.   Burial Rituals
7.   Sacred Writings
8.   Organizational Structure
     a.   Location of Headquarters
     b.   Contact Office/Person

**Tab (B)**

9.   History and Theology
     a.   Basic History
     b.   Theology
10.  Resources
     a.   Periodicals
     b.   Bibliography
     c.   Resources/Supplies
11.  Glossary (if warranted)
12.  Appendices (if warranted)

Religious Beliefs and Practices TRM                    T5360.01
                                                      3/27/2002
                                        Introduction, Page iii


The Tab on Personal and Congregate Religious Items is a
compilation of the lists of personal and congregate religious
items found in each chapter.

The Tab on Religious Diets are excerpted from the chapters and
compiled for ready reference.

As additional chapters on the faith traditions are completed,
they will be added to this Technical Reference Manual.  These
chapters will be published periodically until all the religions
which have been approved for practice by inmates in the Bureau of
Prisons are included.

## OUTLINE FOR RELIGIOUS FAITH GROUPS
## NATIVE AMERICAN (SECTION A)

## 1.  RELIGIOUS PRACTICES

### A.  REQUIRED DAILY OBSERVANCES

A devout practitioner may desire to pray by holding his personal
pipe.  Lighting and smoking the pipe are ordinarily not permitted
in housing units.  These are limited to the Chapel or Outdoor
Worship Area.  The practice of smudging with smoke, used for
ritual cleansing or purification, is also not permitted in the
housing units.  Smudging is limited to the Chapel or Outdoor
Worship area.

### B.  REQUIRED WEEKLY OBSERVANCES

Sweat lodge ceremonies are generally conducted on a weekly basis
in a correctional setting.  If the Native American population is
rather large, two separate sweat lodge ceremonies may be
conducted on a weekly basis to accommodate all participants.
Further, talking circles, other educational opportunities, or
ceremonial song/drum practices are allowed weekly as time and
space permit.

While Native Americans of some tribes or bands in the wider
community may be nude when they participate in the ceremony,
nudity is NEVER authorized in the correctional setting.  Inmates
and visitors participating in sweat ceremonies are required to
wear appropriate outerwear, i.e., sweat pants, or shorts.  Local
policy (I.S.) should clearly delineate the modesty/security
requirement.

When institutional counts are necessary during the sweat,
participants should be respectfully notified of the count by the
staff member responsible for supervision of the ceremony.  The
participants may be given a few moments to finish the round and
open the door for the count.  At that point the participants will
exit the lodge for the count.  Staff should not cross the area
between the fire and the lodge but should walk around the fire or
behind the lodge when a ceremony is in progress.

### C.  REQUIRED OCCASIONAL OBSERVANCES

1.  Annual Spiritual Gathering (Pow-wow).  Depending on the
security level of the institution, the Pow-wow may include
visitors from the inmates' official visiting lists.  If visitors
are allowed to participate, the Pow-wow will ordinarily be held
in the institution's Visiting Room.

2.  Depending on local tribal traditions, seasonal equinoxes and solstices are observed.  These observances are usually accommodated at the next scheduled sacred sweat lodge ceremony.

**D.  RELIGIOUS HOLY DAYS**

American Indian Days, September 24-25.

> #    These holy days were established by the Federal Government.  These days are days free from work.  Since there are so many different tribes, and each tribe observes holy days which have religious significance for its members, it is difficult to find common ground in establishing religious holy days.

Some tribes, for example, often ask to memorialize the "trail of tears" in late December or the Battle at Little Big Horn, June 25th.  To encourage specific needs in the institution, it is recommended that opportunities to sweat in mourning may be appropriately accommodated.  These days, however, should not be days of work proscription.

Because of the large variety of tribal beliefs represented in the inmate population, it is very difficult to be more specific than this.  As requests are made of the chaplains, the institution chaplains are encouraged to contact the Regional Chaplaincy Administrator for further assistance.

**2.  RELIGIOUS ITEMS**

**A.  PERSONAL RELIGIOUS ITEMS**

1.    Medicine bag (worn around neck);
2.    Spiritual bundle containing:
      - Prayer pipe;
      - Feather;
      - Small amounts of sacred herbs (identified locally);
      - Small stones;
      - Sea shell;
3.    Beaded necklace;
4.    Religious medallion and chain;
5.    Ribbon shirts;
6.    Headbands; and,
7.    Medicine wheel.

| **Ribbon Shirt and Beaded necklace:** |
|---|
| Ribbon shirts and beaded necklaces may be worn during Pow Wow's only. |

> **Medicine bag inspection:**
>
> 1. A staff member may direct an inmate to open his/her medicine bag for visual inspection.
> 2. Ordinarily, the bag or its contents will not be handled by staff.
> 3. If questions arise, the chaplain should be contacted.

## B.  CONGREGATE RELIGIOUS ITEMS

1. Sweat lodge, fire pit and altar in the Outside Worship Area;
2. Set of antlers;
3. Ceremonial pipe;
4. Ceremonial drum;
5. Water drum;
6. Flute;
7. Eagle bone whistle;
8. Herbs--typically sage, cedar, sweet grass, and corn pollen, or additional local variations;
9. Animal skull, usually buffalo or bear;
10. Tobacco and/or Kinnikinnick; and,
11. Ceremonial staff.

> **Tobacco and Kinnikinnick:**
>
> As institutions become smoke-free environments, tobacco used for tobacco ties or pipe ceremonies will need to be closely regulated by the Chaplaincy Services Department to ensure that its use is for religious reasons only.

## C.  VISITS BY NATIVE AMERICAN SPIRITUAL LEADERS

Native American spiritual leaders should receive the same professional courtesy and access to inmates that is afforded to ordained clergy.  When Native American spiritual leaders visit the institution, they will generally have a number of sacred religious items with them.  These sacred articles, such as a medicine bundle, small drum, antlers, to name a few, should ordinarily not be handled by staff.  The sanctity of the religious articles are honored in the same way one honors the sanctity of sacred objects in any house of worship.  It is recommended that they be visually inspected.  Botanicals may be tested.  In order to expedite entrance procedures, chaplains are encouraged to request in writing approval from the captain to allow the chaplain to visually inspect the sacred items.  Advance notice of appropriate inspection procedures will be given to the spiritual leader.

**Inspection of sacred bundle of medicine man or elder:**

Chaplains are encouraged to request approval from the captain ahead of time for the chaplain to visually inspect the sacred items carried by an elder in the front lobby of the institution.  The security concerns of the institution will dictate, however, whether or not the sacred items need to be x-rayed.

## 3.   REQUIREMENT FOR MEMBERSHIP

### A.   REQUIREMENTS

Requirements for membership vary greatly with each tribe.  Local religious authorities or tribal elders should be consulted.

### B.   TOTAL MEMBERSHIP

Unknown.

## 4.   MEDICAL PROHIBITIONS

There are no medical prohibitions.  Occasionally an inmate may request a visit from a medicine man asking for prayer, healing or receiving counsel in a medical crisis.

## 5.   DIETARY STANDARDS

There are no special dietary requirements.  Occasionally an individual may desire to fast for a specific purpose.  If the spiritual fast continues for an extended period of time, the chaplain should be consulted.  Since these are private fasts, no special meal accommodations need to be made.

## 6.   BURIAL RITUALS

Local practices vary widely.  Local authorities should be consulted.

Mourning the death of a relative or friend is often an issue in the institution.  Again, local practices vary, but some common practices are:  cutting the hair (sometimes sending it home), fasting, smudging, displaying ashes on the face, and wearing black head wear exclusively.  The time of mourning may last up to one full year.

If the hair is cut, the hair should not remain in the inmate's possession in the housing unit.  Hair is a serious security concern.  The hair may be immediately mailed home or retained in the Chapel until the next Sweat Lodge ceremony where it will be burned.

## 7. SACRED WRITINGS

Few sacred writings exist.  Usually religious traditions are passed on orally through stories, songs and ceremonies.

## 8. ORGANIZATIONAL STRUCTURE

## A. LOCATION OF HEADQUARTERS

Each tribe has its own tribal council.  For Federally recognized tribes, the Bureau of Indian Affairs has a complete listing available on its web site.

## B. RESOURCE PEOPLE

Terry Anderson
1964 127th St.
Surrey, British Columbia
Canada, V4A5W3

Clayton F. Old Elk
Indian Health Service
Office of Health Programs
Parklawn Bldg., Rm 6A-39
5600 Fishers Lane
Rockville, MD 20857
(301) 443-2694
(301) 443-8174 fax

Ben Bushyhead
Cherokee Nation Family Services
777 Arlington Ave.
Bryson City, NC 28713
(828) 497-5001

Lenny Foster
Navajo Project
P.O. Drawer 709
Window Rock, AZ 86515
(520) 871-6234

Dr. George Tinker
Iliff School of Theology
2201 South University Blvd.
Denver, CO 80210
(303) 765-3182

Sam Windyboy
P.O. Box 344
Davidsonville, MD 21035
(410) 956-4156
Email: Walkingbear@USA.net

Albert Whitehat
(605) 856-4463

## RELIGIOUS BELIEFS AND PRACTICES
## NATIVE AMERICAN (SECTION B)

## 9. HISTORY AND THEOLOGY

## A.  BASIC HISTORY

The generally held belief concerning the origin of the Native
American people is that they migrated from northeast Asia to the
Americas over a long period of time.  The regions in which they
settled determined, to a large degree, whether the tribes became
primarily hunters or developed horticultural societies.  Since
almost nothing was written down, much speculation remains
concerning the origins of the many Native American tribes.  There
are 556 different tribes currently recognized by the Federal
Government.  In addition, there are many others which have not
received such official government recognition.

During this period, the religious beliefs of Native Americans
were expressed in many different ways.  Due to the diversity of
the Native American tribes, a concise belief system cannot be
developed.  Another difficulty in developing this concise system
is due to the fact that the religious beliefs are almost
exclusively transmitted from elder to elder as an oral tradition
rather than transmitted in writing.  Some common ideas, however,
appear to be present.  The religions tend to be closely related
to nature and the natural world.  The observable, natural world
is imbued with supernatural meaning, and natural objects have
living spirits.  Ceremonial rituals ensure that communal and
individual prosperity continues.

When the Europeans settled in America, much of the Native
American religious practice was prohibited, and Christianity was
offered as an alternative, often forcefully so.  Persecution
followed and it was not until the American Religious Freedom
Joint Resolution, enacted into law on August 11, 1978, that the
original Native American beliefs were protected by law.

A blending took place between Christianity and some of the Native
belief systems.  The Native American Church is an example of this
blending which has incorporated elements of both Christian and
Native American religious beliefs.  The separation of religion
and culture was also introduced, a division which is unknown in
Native spirituality.  Since many of the New Age movements are
nature based, Native American beliefs have also been incorporated
in those New Age expressions.

**B.   THEOLOGY**

1. <u>Introduction</u>:  Native American cultures are, by nature,
organic and dynamic.  Identity and pride are rooted in
established spiritual traditions and principles.  There is no
clear distinction between spiritual life and cultural life.
Spirituality is a total way of life practiced 24 hours of every
day.  Native Americans do not have celebrations, they have
ceremonies which are the primary vehicles of religious
expression.  A ceremonial leader or elder assures the
authenticity of the religious observances.  Teachings are passed
on in an oral tradition by recognized elders who lead the
ceremonies according to their personal religious experience.  A
direct experience of the Creator is sought during individual and
group rituals.  Native Americans experience spirituality through
symbols while most European Americans use symbols to express
spirituality.  Symbols and sacred objects are fundamental
realities for Native Americans.

Dr. George Tinker, faculty member at the Iliff School of Theology
in Aurora, Colorado, expresses the following:

> "The particular gift of Native American peoples is an
> immediate awareness and experience of the sacredness and
> interdependence of all Creation.  Native American cultures
> are rooted in the Earth which has always been the foundation
> of Indian religious experience.  Native Americans still
> experience the world as sacred and still sense their own
> interrelatedness with all in the world.  This is their
> Native spirituality.  Native People still believe that their
> spiritual insights may contribute much to the understanding,
> theologies, health and well-being of others in the world.
>
> Native American peoples already know about God as the
> Creator and all of Creation as sacred and good, which can
> generate a genuinely healing and life-giving response.
> Moreover, from a Native American perspective, the
> affirmation of God's act of Creation and the sacredness of
> all that has been created necessarily results in
> relationships marked first of all by justice and ultimately
> in relationships of harmony and balance that are a true
> experience of peace.
>
> The Indian understanding of a universal harmony is well
> known.  Indians understand themselves as part of Nature and
> neither apart from it nor somehow possessing over it a
> special privilege to use it.  The harmony with Nature is the
> beginning of all Native American spirituality.  Hence, life
> as a gift is more than just my life or even human life in
> general, but every rock and every tree and every stream is

part of life and has life itself.  And all these things
participate, along with human beings, in a spiritual
harmony.

Perhaps the most precious gift that Native Americans have to
share with other peoples is our perspective on the
interrelatedness of all of creation and our deep sense of
relationship to the land in particular.  We are all
relatives:  from buffaloes and eagles to trees and rocks,
mountains and lakes.

Just as there is no category of the inanimate, there can be
no conception of anything in the created world that does not
share in the sacredness infused in God's act of creation."

2.  <u>Creator</u>:  While spiritual reality and power are to be found
in all of nature for Native Americans, they nevertheless believe
in a Supreme Being, who is often referred to as the Great Spirit,
Great Mystery, Creator, etc.  This Supreme Being is seen as
always caring and willing to listen.

3.  <u>Nature</u>: Native Americans possess a deep and abiding respect
for all things in nature:  animal, plant and mineral life.
Hence, it is necessary to conduct spiritual ceremonies
out-of-doors or directly in contact with the earth.  Since all
nature shares the same life, all nature is related.

4.  <u>Reverence</u>:  The Pipe and Eagle Feather are highly revered by
Indians and should ordinarily be handled in the prison setting
only by the inmate pipe holder, a Spiritual leader, or a
designated prison official.  Respect for these items is inherent
for an Native American.  He/she believes that the sacred must not
be mocked or misused because this blasphemes life itself.
Therefore, items that Native Americans associate with their
spirituality should be approached with sensitivity and respect by
prison staff.

5.  <u>Spiritual/Cultural</u>:  Native American cultural and spiritual
beliefs and practices are inseparable.  Thus, such practices as
the wearing of long hair, headbands, certain items of traditional
clothing, and the practice of certain arts (i.e., beadwork and
leather craft) are as much statements of religious belief and
spirituality as they are expressions of culture.  Further, in
time of mourning, a Native American may cut his/her hair and
request that it be sent home or buried outside the institution.
These and other spiritual practices affirm identity with a
people, a geography, and the Great Spirit.  Ted Means, Director
of Heart of the Earth Prison Program, states:

"Our whole lifestyle as a people comes from a spiritual
base.  All our social gatherings have a spiritual base.  We
must be able to come together, to have our own space, like

the Sweat Lodge, which we feel is ours even in prison.  We
also need specific time for a pipe ceremony and other
gatherings."

6.  Spiritual Leadership:  Spiritual leadership in Native
American traditions varies from tribe to tribe.  Sometimes
leadership is elected or inherited, but more often it is the
result of a personal calling or vision combined with the exercise
of the wisdom and good judgment which produce respect.  For the
Native American, respect is the true foundation of all genuine
leadership, both temporal and spiritual.  There is no religious
hierarchy whereby one is "ordained" by the group or another
individual as an Native American spiritual leader

Native American religion is very much an individual matter.  Each
person is directly responsible to the Creator for his/her
thoughts.  Elders and spiritual leaders guide, teach, counsel,
and lead ceremonies, but never dictate belief or doctrine.
Spiritual leaders are ordinarily provided for Native American
inmates by contracting with the institution or by volunteers.

7.  Natural Objects:  Natural objects such as stones, shells,
feathers, plants, and animal bones, claws, and teeth have major
roles in Indian spiritual practice because they are reminders of
certain important principles or qualities.  These serve as
reservoirs of spiritual power.  The specific objects chosen by
the Native American to express his/her religion will vary
according to personal tradition or vision.

Native Americans prohibit women from handling the pipe, or
nearing the Sweat Lodge and other sacred object during
menstruation, because they believe that her menstruation-related
energy overpowers the power of the sacred object.  Should these
prohibitions be violated, a separate ceremony must be held to
restore the power of the objects.  Female staff should make every
effort to respect this belief, and absent themselves from these
areas during these times, unless security of the institution
requires otherwise.  Security, however, should not be
compromised in sacred areas due to absence of male staff.

Traditionally, many Native Americans carry, wear, and maintain
the medicine bag.  The medicine bag may contain such natural
objects as stones, animal parts, herbs, or seeds and kernels of
maize, corn or other vegetables.  Native Americans believe that
each natural object possesses a spirit.  As part of one's
medicine bag, the spirits of these objects become part of the
wearer.  The medicine bag becomes the wearer's invocation to the
Creator to continually be with and watch over him/her.  It
represents an extremely personal relationship between the Creator
and the wearer, and care should be taken that the Indian's
spiritual significance of the medicine bag not be violated.

8.  <u>Herbs</u>:  The daily burning of sweet grass, sage, cedar, or
other indigenous herbs is a widespread practice for those who are
deeply involved in Native spirituality.  Personal possession of
small quantities of certain herbs by Indian inmates is usually
permitted.  The bitterness of the sage smoke reminds the Native
American of the hard, difficult times that Creator has led them
through, and the sweet grass smoke evokes the good times that
Creator has given.  As herbs are burned, the smoke purifies the
body so nothing unclean participates in the ceremony.  The sacred
plants (sweet grass, sage, cedar, tobacco and corn pollen) are
used in group ceremonies.  Tobacco is used as an offering and in
prayer.  Sage, sweet grass, and cedar are used in cleansing,
blessing, and purification. In smoking the Sacred Pipe, the herb
is either tobacco or kinnikinnic (a blend of tobacco, barks, and
roots).  Native Americans believe tobacco should never be wasted
because it was given by the Creator for offering.  Ordinarily,
ceremonial (congregate) smoking is limited to the Chapel area,
Sweat Lodge site in the Outside Worship area or another area
designated by the chaplain.

9.  <u>Tobacco Ties</u>:  Tobacco ties are small colored pieces of cloth
containing tobacco and symbolizing prayers.  Native Americans
often tie them to the lodge pole by the altar in front of the
Sweat Lodge or carry them.  They are often burned during lodge
ceremonies to carry the prayers to the Creator and are similar to
devotional items used in other faiths.

As institutions become smoke-free environments, tobacco used for
tobacco ties or pipe ceremonies will need to be closely regulated
by the Chaplaincy Services Department to ensure that its use is
for religious reasons only.

l0.  <u>The Sacred (Ceremonial) Pipe</u>:  The Sacred Pipe is the
cornerstone of the spiritual teachings of most Native American
tribes.  A high degree of reverence is given the Sacred Pipe as
central to traditional religious belief and practice.  When bowl
and stem are joined together, the pipe should be accorded the
same respect that one would give the most sacred items and
writings of their own faith tradition.  The pipe and bowl should
never be joined together without the intent to smoke it as part
of the offering of prayers.  Pipes are used for both private and
group prayers.

The Sacred Pipe and bundle include a pipe bowl, a stem of wood,
and may include other sacred objects such as feathers, ribbons,
bones, teeth, fur, beads, sage, tobacco, sweet grass,
kinnikinnic, corn and other items.  They are kept in a suitable
wrap such as an animal skin or cloth.  Proper care of and respect
for the pipe is essential.  Prison personnel should be made aware
of the high spiritual significance of the Sacred Pipe and the
reverence with which it is held.  It should be visually rather
than manually inspected.

The pipe may be secured in the chapel or locked in the Sweat
Lodge area.  Native American inmates who are pipe carriers may be
allowed to have a personal pipe for private prayers in their
areas, although smoking the pipe is limited to the chapel or
ceremonial site.

If, after visual inspection, it is suspected that the pipe is
used to conceal contraband, staff may confiscate the pipe for
appropriate action.  Due to the sensitivity surrounding the
Sacred Pipe, care should be taken to provide justification for
any lengthy inspection or confiscation.  The chaplain should be
involved in all inspection procedures related to the Sacred Pipe.

11.  <u>Feathers</u>:  Birds and feathers are sacred to Native
Americans, but the eagle is regarded in a special way.  The eagle
represents power, strength, healing, and loyalty for the Indian.
Eagle feathers are considered sacred and cannot be purchased by
Native Americans for personal possession, but can only be awarded
or given by another.

Since eagles are an endangered species, these feathers can be
obtained only through forms <u>50 CFR 13 and 22</u> issued by the U.S.
Department of the Interior, Fish and Wildlife Service.  In order
to receive eagle feathers, a Bureau of Indian Affairs
registration number is required.  It is against the law for
inmates whose official religious preference is Native American,
but who do not have a Bureau of Indian Affairs registration
number, to apply for, receive and keep eagle feathers.  Feathers
are usually kept wrapped in a piece of leather or other suitable
material.

**Animal Claws and Talons:**

Animal claws and talons hold a sacred significance for many
Native Americans.  However, the potential for use as weapons
makes them generally inappropriate for possession in a
correctional setting.

12.  <u>Sacred Circles, Sacred Colors and Seven Directions</u>:  The
symbol of the circle is sacred to all Indians.  Prayers are
always offered in a circle.  Native Americans rarely sit in a
room in rows as other Americans do in religious services.
Ceremonies are usually conducted in the shape of a circle which
represents the limits of the people and of the nation.  More than
this, the circle represents the sacred hoop of the whole world,
demonstrating the unity of all creation and meaning.  Entrance
into and exit from the Sweat Lodge is done in a clockwise and
counterclockwise manner.

Significant decision-making meetings are also conducted in
circles called Talking Circles where the participants attempt to
reach consensus through discussion and prayer.  The sacred pipe
is often passed during deliberations of this nature.

The four horizontal directions are significant:

#    East (yellow) is usually the location of the spirit of
     enlightenment, guidance and direction;

#    South (black) is usually the place of the spirit of growth,
     particularly after winter;

#    West (red) is usually the doorway one goes through when
     leaving this world and returning to the spirit world; and,

#    North (white) is usually the location of the spirit of
     healing and reconciliation.  These spirit helpers are always
     present and within the circle.

The circle and the four directions are often brought together in
what is called the medicine wheel.

In addition, three other directions have significance:

#    Up, for Grandfather Sky;

#    Down, for Mother Earth; and,

#    Inward, for the individual's heart.

13.  Headband:  The headband for the Native American has
significance, in varying degrees, in all traditions.  The
headband completes and symbolizes the circle for the wearer.  It
is believed to maintain oneness with order, conveying clear and
respectful thinking.  Significantly, some tribes intentionally do
not wear headbands during time of war and battle because these
are times of disorder.  The headband may be worn everyday or on
special occasions such as the Pipe, Blessing, Healing, Sweat
Lodge, and other ceremonies to invoke the spirits for a good
blessing.  It can be blessed by a Medicine Man and/or spiritual
advisor with appropriate prayers and songs.  Generally, headbands
have universal colors, each color symbolizing something specific
(i.e. Blue--Sky or Deity; Red--Power or Strength; Green--Mother
Earth; White--Purity; Yellow--Corn Pollen Road; Black--Darkness
or Infinity).  Where issues of security warrant it, the inmate's
name and number may be discreetly stenciled on each headband.

14.  Drum:  The drum is seen as the heartbeat of both the earth
and the Native American Nation.  It brings the Native peoples
together in a Sacred Circle and reunites all in spirit and
purpose.  The drum is believed to reconnect the Native Americans

Religious Beliefs and Practices

T5360.01
3/27/2002
Native American, Page 14

with the earth and, through it, the Native American sends forth
prayers.  There is one drum used for healing sweats, and a larger
size drum used in ceremonies.

15.  <u>Rattles</u>:  In healing ceremonies, rattles are shaken to call
the spirit of life which takes care of human beings.  They are
also used during the Sweat Lodge ceremony when the elder invites
the Spirits of the four directions to come in and help the
participants who are seeking a spiritual and physical cleansing
in order to start a new life.

16.  <u>Pow-wow (Spiritual Gathering)</u>:  The Pow-wow is a day of
traditional dancing, speaking, and praying in word, song, and
music for all that lives.  The gathering of inmates (often with
guests from the outside, who may be dressed in
ceremonial/liturgical garb) symbolizes a renewal of unity in the
Spirit.  A feast of traditional, familiar foods (such as fry
bread, corn pemmican, and buffalo meat) is seen as central to the
gathering.  The spiritual advisor(s) establish the order of
events for the gathering.  All elements in the Pow-wow constitute
a whole prayer.

"Give-aways," gifts often made by the inmates for the guests, may
be authorized.  These gifts should be inspected and approved
prior to the beginning of the ceremony.  Guests are not
authorized to bring "give-aways" to the ceremony for
distribution.  No "give-aways" may come back into the
institution.

17.  <u>Fasting</u>:  Fasting is a special form of prayer that is guided
by an elder who provides the necessary ceremonial setting and
conditions.  Fasting involves total renunciation of food and
water for a period of days determined by the one who is fasting.
Health conditions must be evaluated by the proper authorities
before commencement of the fast.  The chaplain should be
consulted and continue as an advisor during any extended
spiritual fast by an Native American inmate.

18.  <u>Sacred Sweat Lodge Ceremony</u>:  Equal to the Sacred Pipe as a
cornerstone of Native American traditions is the purification
ceremony of the Sweat Lodge.  Many lodge rituals are for communal
prayer purposes and others are for personal healing.  To enter
the Sweat Lodge is to return to the womb of Mother Earth for
purification, strength, guidance, and for physical, mental,
emotional and spiritual healing.  Rocks, wood, fire, and water
are used in the process.  The participants also offer their
suffering and prayers for one who is sick, one who needs help,
and for all of creation.  These prayers are spoken, chanted, and
sung for the interrelatedness of all life.  There are typically
four periods of prayer called "rounds" or "doors."  Each period
ends with a prayer or shout as the door flap is thrown open and
the cool breath of the Creator welcomes all into new life.

Religious Beliefs and Practices                              T5360.01
                                                           3/27/2002
                                          Native American, Page 15

The Lodge itself is usually a dome-shaped structure made of
willow or other saplings indigenous to the area.  The saplings
are lashed together with twine or bark.  The structure is then
covered with a tarpaulin, blankets or canvas to make it light
proof.  As a receptacle for the rocks, a small pit is dug in the
center of the lodge.  The doorway may face east or west according
to the tribal practices of the participants.

Outside the Lodge, a small earthen mound is built as a sacred
altar, using the dirt from the pit inside.  Prayer symbols, a
lodge pole, and rocks arranged in a medicine wheel are placed on
the altar.  Beyond the altar is the fire pit for heating the
rocks.  A rake and scoop are needed to carry the rocks into the
Lodge.  Rocks are brought in at the beginning of the rounds or
doors, often using antlers to move the rocks from the scoop to
the pile.  Water is sprinkled on the hot rocks, producing steam
and heat.  Some western tribal rituals call for a dry sweat,
where water is not used to create steam.

Everything about the Sweat Lodge is ceremonial and sacred, from
the construction of the Lodge, altar and fire pit, to the use of
fire and the disposal of the ashes.  To preserve the sanctity of
the lodge, altar and fire pit, it is appropriate to place a soft
barrier around this area.  Separate fences should not be
constructed to create various "rooms" for other faith groups,
because the concepts of space neutrality and shared space are
central to the effective management of the Chapel program.

---

**Sacred Space:**

1.  Since the sacred path from the fire pit to the lodge door
    must always be respected as sacred, it would be
    appropriate to set off this area with low hedges, stone
    formations, plants or other natural barriers that will
    prevent inadvertent violation of the sacred area.
2.  Separate fences should not be constructed to create
    various "rooms" for other faith groups, because the
    concepts of space neutrality and shared space are central
    to the effective management of the Chapel program.

---

The Sacred Pipe is often smoked during the second round after the
purification of the first round.  A "door man" or "fire keeper"
brings in the rocks and coordinates the rounds with the sweat
leader.  At the end of the ceremony, participants are rinsed off
with cold water from a shower, hose, or bucket.  The duration of
the ceremony from the **time of the lighting of the fire to the
final rinse should not exceed four hours**.  Sweats should
ordinarily be scheduled during a period of time which will
**accommodate the institution schedule and not necessitate
out-counts**.

When institutional counts are necessary during the sweat,
participants should be respectfully notified of the count by the
staff member responsible for supervision of the ceremony.  When
appropriate, the participants may be given a few moments to
finish the round and open the door for the count.  At that point
the participants will exit the lodge for count.  Staff should not
cross the area between the fire and the lodge but should walk
around the fire or behind the lodge when a ceremony is in
progress.

While Native Americans of some tribes or bands in the wider
community may be nude when they participate in the ceremony,
nudity is never authorized in the correctional setting.  Inmates
and visitors participating in sweat ceremonies are required to
wear appropriate outerwear, i.e., sweat pants, or shorts.  Local
policy (Institution Supplement) should clearly delineate the
modesty/security requirement.

Since the lodge is in an outdoor area, it is recommended that the
area be surrounded by fencing which provides a degree of privacy
and respect without jeopardizing security.  Wood for the fire
will be provided by institutional resources.  Participation in
the Sweat Lodge is not usually limited to those of Indian
ancestry alone.  An understanding of Native American traditions,
as well as religious preference will be considered in authorizing
participation in the Sweat Lodge.

## 10.  LITERATURE

### A.  PERIODICALS

**News From Indian Country**
Route 2, Box 2900-A
Hayward, WI 54843
(715) 634-5226

**Indian Country Today**
1920 Lombard Drive
PO Box 2180
Rapid City, SD 57701
(605) 341-0011

### B.  BIBLIOGRAPHY

Beck, Peggy V., Anna Lee Walters and Nia Francisco, **The Sacred:
Ways of Knowledge, Sources of Life,** Navajo Community College
Press, 1992.

Bierhorst, John, **The Sacred Path: Spells, Prayers and Power Songs of the American Indians**, New York: William Morrow and Company, 1983.

Brown, Joseph Epes, ed., **The Sacred Pipe: Black Elk's Account of the Seven Rites of the Oglala Sioux,** University of Oklahoma Press, 1953.

Bruchac, Joseph, **The Native American Sweat Lodge: History and Legends**, The Crossing Press, 1993.

Deloria, Vine, Jr., **God is Red: A Native View of Religion**, 2nd ed., Fulcrum Publishing, 1994.

Erdoes, Richard, and Alfonso Ortiz, eds., **American Indian Myths and Legends**, Pantheon Books, Random House, 1984.

Fergusson, Erna, **Dancing Gods: Indian Ceremonials of New Mexico and Arizona**, University of New Mexico Press, 1990.

Neihardt, John G., **Black Elk Speaks: Being the Life Story of a Holy Man of the Oglala Sioux,** University of Nebraska Press, 1932 and 1979.

Powers, William K., **Oglala Religion,** University of Nebraska press, 1977.

St. Pierre, Mark, and Tilda Long Soldier, **Walking the Sacred Manner:  Healers, Dreamers, and Pipe Carriers-Medicine Women of the Plains Indians,** Touchstone, Simon and Schuster, 1995.

Steltenkamp, Michael F., **Black Elk: Holy Man of the Oglala,** University of Oklahoma Press, 1993.

> \#    Biography based on interviews with Black Elk's daughter Lucy Looks Twice and others who knew him.

Suzuki, David, and Peter Knudson, **Wisdom of the Elders: Honoring Sacred Native Visions of Nature,** Bantam Books, 1992.

Tuchman, Gail, **Through the Eye of the Feather: Native American Visions**, Gibbs Smith Publisher, 1994.

Vecsey, Christopher, ed., **Religion in Native North America**, University of Idaho Press, 1989.

Walker, James R., **Lakota Belief and Ritual**, edited by Raymond J. De Mallie and Elaine A Jahner, University of Nebraska Press, 1991.

Wall, Steve, and Harve Arden, **Wisdom-Keepers: Meetings with
Native American Spiritual Leaders,** Beyond Words Publishing, 1990.


## C.   RESOURCES/SUPPLIES

Canyon Records
4143 North 16th Street
Phoenix, AZ 85016
(602) 266-4823

Crazy Crow
P.O. Box 847 D-10
Pottsboro, TX 75076
(800) 786-6210
www.crazycrow.com

Noc Bay Trading Post
P.O. Box 295
Escanaba, MI 49829
(800) 652-7192
www.nocbay.com

North Star Trading Post
P.O. Box 10089
Spokane, WA 99209
(509) 327-1038

Parson's Trading Post
370 Wisconsin Dells Parkway
Wisconsin Dells, WI 53065

Shenandoah Film Productions
5386 G Street
Arcata, CA 95521
(707) 822-1030

> #   Source for Native American videos dealing with a
>     variety of subjects, such as storytelling, recovery and
>     individual Native leaders.  The video, The Medicine
>     Wheel, used in Advanced Chaplaincy training is produced
>     by this company.

Sioux Trading Post
502 West Blvd
Rapid City, SD 57701
(605) 348-4822

The following web sites have extensive lists of Native American
Trading Posts:

www.Indiantraders.com
www.Whisperingwind.com

## D.  NATIVE AMERICAN ORGANIZATIONS

**American Indian Archaeological Institute (AIAI)**
38 Curtis Rd.
P. O. Box 1260
Washington Green, CT 06793-0260
(203) 868-0518
(203) 868-1649 Fax

> \#     Provides information on the Northeastern woodlands
>        tribes of the United States including a 2000 volume
>        library and museum center.

**American Indian Culture Research Center (AICRC)**
Box 98
Blue Cloud Abbey
Marvin, South Dakota 57251
(605) 432-5528

> \#     Aids in educating the non-Indian public about the
>        philosophy of Native American people and assists in
>        rebuilding communities.

**American Indian Health Care Association (AIHCA)**
245 E. 6th St., Ste. 499
Saint Paul, MN 55101
(612) 293-0233

> \#     Assists urban health care centers in management and
>        education.

**American Indian Heritage Foundation (AIHF)**
6051 Arlington Blvd.
Falls Church, VA 22044
(202) 463-4267
www.Indians.org

> \#     Educates non-Indians on cultural heritage of Native
>        Americans.  Maintains a museum and extensive library.

**American Indian Historical Society (AIHS)**
1493 Masonic Avenue
San Francisco, CA 94117
(415) 626-5235

> \#     Offers support for educational and cultural programs.

**American Indian Library Association (AILA)**
c/o American Library Association
50 E. Huron St.
Chicago, IL 60611

> # Dedicated to providing assistance to Native Americans
> in library services.

**Cherokee National Historical Society (CNHS)**
P. O. Box 515
Tahlequah, OK 74465
(918) 456-6007

> # Preserves history and tradition of the Cherokee people
> and assists in educating the general public.

**Council for Native American Indians (CNAIP)**
280 Broadway, Suite. 316
New York, NY 10007
(212) 732-0485

> # Organization of individuals interested in philosophy
> and teachings of the earlier indigenous groups.
> Conducts research.

**Gathering of Nations**
P. O. Box 75102, Sta. 14
Albuquerque, NM 87120-1269
(505) 836-2810

> # Promotes the expression of Native American culture and
> religion.

**E.  U.S. FISH AND WILDLIFE SERVICE**

Application for eagle feathers and parts can be made to the
Department of the Interior, US Fish and Wildlife Service,
National Eagle Repository.  There are seven regions in the
country.  For more information, the web site is:
www.r6.fws.gov/eagle or type National Eagle Repository in a
search engine and you will readily have the information
available.

U.S. Fish and Wildlife Service
National Eagle Repository
Rocky Mountain Arsenal, Building 619
Commerce City, CO 80022
(303) 287-2110

Religious Beliefs and Practices

### ATTACHMENT 1 - SWEAT LODGE

This schematic provides suggested dimensions for the sweat lodge, altar and fire pit.  This is sacred space for the Native American spiritual tradition in the Outside Worship Area.





Some considerations in constructing a Sweat Lodge are:

**The Area**:  Ordinarily, an area approximately 40 feet by 40 feet
is sufficient for an Outside Worship Area in which the Sweat
Lodge can be built.  However, in institutions having a large
Indian population, or in institutions where the space is shared
with other groups, a larger area may be required.  To protect the
sacredness of the ceremonies performed there, the outdoor worship
area should be situated in an area that affords as much privacy
as possible, given the custody and security issues of the
institution.  Consideration should also be given to ventilation
of smoke from the small wood fire and that a drum is used during
the ceremony.  Additionally, the area needs to be situated near a
water supply.

Just as in indoor chapel areas, the fenced space surrounding the
lodge should be neutral in its decor and adornment.  It may be
necessary to use the fenced outdoor space for other religious
groups which have legitimate claims to outdoor worship space.

+------------------------------------------------------------------+
| **Sacred Space:**                                                |
+------------------------------------------------------------------+
| 1.   Since the sacred path from the fire pit to the lodge door   |
|      must always be respected as sacred, it would be             |
|      appropriate to set off this area with low hedges, stone     |
|      formations, plants or other natural barriers that will      |
|      prevent inadvertent violation of the sacred area.           |
| 2.   Separate fences should not be constructed to create         |
|      various "rooms" for other faith groups, because the         |
|      concepts of space neutrality and shared space are central   |
|      to the effective management of the chapel program.          |
+------------------------------------------------------------------+

**Time Requirements**:  The time allocated for the Sweat Lodge should
be sufficient to allow for the fire to be started, rocks heated,
and ceremony to be conducted.  This will ordinarily take about
3-4 hours.  It is reasonable to require participants to conclude
their ceremony within four hours.  It may be necessary to place
one fire keeper on outcount if there is not a four hour window
for scheduling the process from start to finish.

**Frequency**:  In Bureau of Prisons institutions the Sweat Lodge is
typically used once each week, but may be operated more
frequently as the program requirements of the Chaplaincy
Department and institution allow.  The chaplain may request
approval for additional use of the Sweat Lodge in cases where
individuals express special needs.  Inmates may often request to
observe national holidays, deaths, and the seasonal equinox or
solstice with a sweat lodge ceremony.

**Dimensions**:  The dimensions of the Sweat Lodge will depend on the average number of people expected to use it.  An ordinary Sweat Lodge will be approximately 7-12 feet in diameter and 4-5 feet high.

**Rocks**:  Lava rocks are preferred.  Sandstone is generally not very serviceable as these have a tendency to crack and create hazardous sparks.  The number of rocks is determined by their size and density and the size of the lodge being heated, as well as the length of time they are expected to retain heat (i.e., the length of the round or door).

**Wood**:  Wood that is clean (nails removed and safe for burning) will be on hand prior to the beginning of each ceremony.  Chemically treated wood is hazardous.  Adequate amounts of wood will be needed to heat the rocks, but inmates are encouraged to exercise reasonable judgement and respect for the wood, as they determine the time and amount of wood necessary to heat the rocks.  Smaller rocks can be heated faster, thus preserving wood.

Approximately 26 to 40 willow branches, twelve to fourteen feet in length, or other saplings are needed to construct the Sweat Lodge.

**Tools & Ceremonial Items**:  A shovel, rake, dipper, bucket, water, and canvas will be needed, as well as sage, sweet grass, Sacred Pipe, tobacco, cedar, forked sticks for altar, and such other Indian 'medicine' items as described in other sections of this booklet.  These items should be stored in a locked secure area when not in use.  Some items may require shadow board accountability, depending on the mission of the institution and the tool classification.

**ATTACHMENT 2**
**AMERICAN INDIAN RELIGIOUS FREEDOM JOINT RESOLUTION**

***American Indian Religious Freedom Joint Resolution***
**Public Law 95-341, dated August 11, 1978**

Whereas the freedom of religion for all people is an inherent right, fundamental to the democratic structure of the United States and is guaranteed by the First Amendment of the United States Constitution:

Whereas the United Sates has traditionally rejected the concept of a government denying individuals the right to practice their religion and, as a result, has benefitted from a rich variety of religious heritages in this country:

Whereas the religious practices of the American Indian (as well as Native Alaskan and Hawaiian) are an integral part of their culture, tradition and heritage, such practices forming the basis of Indian identity and value systems:

Whereas the traditional American Indian religions, as an integral part of Indian life, are indispensable end irreplaceable:

Whereas the lack of a clear, comprehensive, and consistent Federal policy has often resulted in the abridgment of religious freedom for traditional American Indians:

Whereas such religious infringements result from the lack of knowledge or the insensitive and inflexible enforcement of Federal policies end regulations premised on a variety of laws:

Whereas such laws were designed for such worthwhile purposes as conservation and preservation of natural species and resources but were never intended to relate to Indian religious practices and, therefore, were passed without consideration of their effect on traditional American Indian religions:

Whereas such laws and policies often deny American Indians access to sacred sites required in the religions, including cemeteries:

Whereas such laws at times prohibit the use and possession of sacred objects necessary to the exercise of religious rites and ceremonies:

Whereas traditional American Indian ceremonies have been intruded upon, interfered with, and in a few instances banned: Now, therefore, be it

*Resolved the Senate and House of Representatives of the United States of America in Congress assembled,* That henceforth it shall be the policy of the United States to protect and preserve for

Religious Beliefs and Practices

American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonial and traditional rites.

Sec. 2. The President shall direct the various Federal departments, agencies, and other instrumentalities responsible for administering relevant laws to evaluate their policies and procedures in consultation with native traditional religious leaders in order to determine appropriate changes necessary to protect and preserve Native American religious cultural rights and practices.  Twelve months after approval of this resolution, the President shall report back to the Congress the results of his evaluation, including any changes which were made in administrative policies and procedures, and any recommendations he may have for legislative action.

# EXHIBIT 2

501 KAR 6:020

| | Policy Number | Total Pages |
|---|---|---|
| **KENTUCKY CORRECTIONS** Policies and Procedures | 16.1 | 8 |
| | Date Filed | Effective Date |
| | October 12, 2012 | February 1, 2013 |

| Authority/References | Subject |
|---|---|
| KRS 196.035, 197.020; *Bell v. Wolfish,* 411 U.S. 520 (1970); *Kentucky Dept. of Corrections v. Thompson,* 109 S.Ct. 1904, 104 L.Ed.2d 506(1989); ACA 4-4156, 4-4267, 4-4498, 4-4499-1, 4-4500, 4-4501, 4-4503, 2-CO-5D-01, 2-CO-5E-01 | **INMATE VISITS** |

I.      DEFINITIONS

"Immediate family" means the following:

1.      parents, including step-parents and those who may have reared the inmate in place of parents;

2.      grandparents;

3.      brothers and sisters and other sibling relations, for example, half and step siblings;

4.      spouse and children, including step-children or adopted children;

5.      son-in-law, daughter-in-law, sister-in-law, brother-in-law, mother-in-law, father-in-law;

6.      a child to whom the inmate, although not a natural parent, acted as a parent; and

7.      grandchildren.

"Special Management" is defined by CPP 10.2.

II.     POLICY and PROCEDURE

A.      Visiting Facilities

1.      The Warden shall provide a clean, comfortable, safe visiting area for the inmate and visitors and shall provide adequate supervision and security.  If adequate space and funding is available, the Warden may have a portion of the visiting area equipped to provide activities for children.

| Policy Number | Effective Date | Page |
|:---:|:---:|:---:|
| 16.1 | February 1, 2013 | 2 |

2.      Regular visiting areas may be arranged to permit personal contact but the entire visiting area, visitors, and inmates shall be continuously supervised.

3.      Outdoor visiting areas may be provided inside the security perimeter and under the same degree of supervision as described in 1 and 2 above.

4.      Areas for non-contact visits may be provided for inmates who have demonstrated a substantial security risk.

B.      Visiting Times

Each Warden shall establish visiting times.

C.      Frequency and Number of Visitors

1.      The Warden may allow each inmate the opportunity to visit a minimum of eight (8) hours per month as permitted or restricted by this policy.

     a.      Visiting limitations and restriction of lengths of visits shall be established to avoid overcrowding.

     b.      Any visitor may be barred for security reasons.

2.      The Warden shall establish consistent procedures as to the maximum number of people, the number of visiting hours per month, and the number of visits per visitor that an inmate may receive based on space allocation, staff resources, and the existence of a threat to security and order of the institution.

3.      An exception may be made to any institutional procedure if special circumstances arise; however, a request for an exception shall be made and approved one (1) week in advance by the Warden or his designee. Special circumstances shall include:

     a.      Distance the visitor travels;

     b.      Frequency of visits for a particular inmate;

     c.      Health problems of an inmate or visitor; or

| Policy Number | Effective Date | Page |
|:---:|:---:|:---:|
| 16.1 | February 1, 2013 | 3 |

      d.     A visit for business purposes if a decision is needed that substantially affects the assets or prospects of a business or property.

    4.     Visiting shall be scheduled so that inmate work and programming schedules are not interrupted.

D.    Allowed Visitors

    1.     Each institution shall maintain an approved visitation list for all inmates. An inmate may request visitation from any immediate family, as verified by the Presentence and Postsentence Investigation Report or other verified source. In addition to immediate family, an inmate may request visitation from three (3) additional adults and one (1) clergy. The visitation list may be updated twice a year based on the last digit of an inmate's institutional number:

      a.     January and July for digits 1 and 2

      b.     February and August for digit 3

      c.     March and September for digits 4 and 5

      d.     April and October for digit 6

      e.     May and November for digits 7 and 8

      f.     June and December for digits 9 and 0

    2.     A visitor shall complete a visiting information form and forward it to the Warden's office or call and provide the information to the assigned Classification Treatment Officer before any visit is allowed. It is the inmate's responsibility to inform the potential visitor of this requirement and to send a form and the Warden's address to the potential visitor. The visiting information form shall contain:

      a.     The inmate's name and number; and

      b.     The requested visitor's:

         (1)    name;
         (2)    address;
         (3)    date of birth;

| Policy Number | Effective Date | Page |
|:---:|:---:|:---:|
| 16.1 | February 1, 2013 | 4 |

     (4)     social security number;
     (5)     sex;
     (6)     race; and
     (7)     relationship to inmate.

3.     An inmate shall not receive a completed visitor information form from a visitor or submit it to a Classification and Treatment Officer.

4.     If an inmate does not have any immediate family, the Warden may, at his discretion, increase the number of adult visitors.

5.     An individual shall not be allowed to visit an inmate unless his name appears on the approved visitation list.

6.     The visitation list shall originate at the institution where the Presentence and Postsentence Investigation Report is initially received.

7.     Falsification of visitor information may be cause to deny approval of the visitor and may result in disciplinary action.

8.     Except for clergy, a visitor shall not be placed on more than one (1) inmate list unless both inmates are immediate family members of the visitor. The relationship may be verified by the Warden's designee.

9.     A visitor, including clergy, shall not visit more than one (1) inmate at a time unless authorized by the Warden or his designee.

10.     Children under the age of eighteen (18) shall not visit unless approved and included on the inmate's visiting list and accompanied by a parent or legal guardian or by another immediate family member with written parental or guardian approval. The name of the parent, legal guardian, or other immediate family member accompanying the child shall be included on the approved visitation list.

     a.     A non-parent or guardian family member accompanying a minor shall have the written, signed, and notarized consent of the parent or guardian. This consent shall be presented to the visiting officer upon registration.

     b.     A person under the age of eighteen (18) who provides proof of marriage to an inmate may be placed on the visiting list.

| Policy Number | Effective Date | Page |
|---|---|---|
| 16.1 | February 1, 2013 | 5 |

11. Persons exempted from the visitation list: attorneys, governmental officials, law enforcement officials visiting on official business, or approved volunteers may be approved for visitation on a case by case basis with prior written approval of the Warden or his designee.

12. Visitation by an ex-offender, parolee, probationer, or former Department of Corrections employee shall not be permitted without prior approval by the Warden or his designee, the Parole or Probation Office, if applicable, and shall not occur until one (1) year following: (a) the date of release from an institution for either parole or conditional release; (b) placement on probation status; or (c) termination of employment with the Department of Corrections.

E. Excluded Visitors

A visitor may be excluded from the institution if:

1. The presence of the visitor in the institution constitutes a probable danger to institutional security or interferes with the orderly operation of the institution;

2. The visitor has a past record of disruptive conduct;

3. The visitor is under the influence of alcohol or drugs;

4. The visitor refuses, upon request from the officers, to show proper photo identification. If it is an initial visit, the visitor may be permitted entry without proper identification; however, any subsequent visit shall not be permitted unless photo identification is provided;

5. The visitor refuses upon request from a correctional officer to submit to a search; or

6. The visitor is directly related to the inmate's criminal behavior.

F. Identification

Each visitor eighteen (18) years of age and above shall be required to show proof of identification with a driver's license or photo identification.

G. Inmates in Administrative Visiting Controls

| Policy Number | Effective Date | Page |
|:---:|:---:|:---:|
| 16.1 | February 1, 2013 | 6 |

    1.      An inmate in disciplinary segregation may be allowed normal visiting times and hours in a restricted setting.

    2.      Other inmates in Special Management may be allowed normal visiting hours but may be restricted to a more secure visiting area if a threat to the security or order of the institution exists.

    3.      An inmate found guilty of a Category IV(2) disciplinary report shall be allowed visitation on a restricted schedule or in a non-contact area for a period of six (6) months from the time of the Adjustment Committee hearing.   The maximum security facility shall impose non-contact visitation for one (1) year.

    4.      A subsequent conviction of a Category IV(2) or Category VI(15) disciplinary report shall result in non-contact visiting for a period of one (1) year per conviction.  These visiting restrictions shall run consecutively.

H.    The Visit

    1.      An inmate in the regular visiting area shall be allowed brief physical contact (example:  holding hands, kissing, and embracing).  This contact shall be permitted within the bounds of good taste and only at the beginning and end of the visit.

    2.      Sexual stimulation or activity shall be strictly prohibited.

    3.      The inmate shall be frisked or strip searched before and after visits.

    4.      The inmate may be restricted to few or no articles in his possession while in the visiting area.

    5.      Children shall be under control at all times and shall be the responsibility of the accompanying adult.

    6.      Staff shall supervise every inmate visit to ensure the security and order of the institution.

    7.      The visitor and inmate shall be treated in a courteous and positive manner. Instructions shall be given in a firm but positive manner.

    8.      A visit shall be conducted in a quiet and orderly manner and may be terminated if visiting procedures are not followed or the inmate or visitor becomes disruptive.

| Policy Number | Effective Date | Page |
|:---:|:---:|:---:|
| 16.1 | February 1, 2013 | 7 |

9.  The inmate may hold his minor child, or minor stepchild, on his lap in an appropriate manner during the visit.  Any inappropriate behavior may lead to an immediate termination of the visit and possible disciplinary action.

10.  Clergy shall be allowed to bring to the visit one (1) copy of the sacred writings of his identified faith, e.g., Holy Bible, Holy Qur'an, etc.

I.  General Visiting Procedures

1.  Each adult visitor shall be identified and required to register upon entry to the institution.

2.  Minors or children included on the approved visiting list shall be registered by the accompanying parent, guardian, or authorized immediate family member.

3.  Staff may require a visitor to submit to a personal search of his person, any object brought with him, and any vehicle brought onto institutional grounds as a condition of allowing or continuing a visit.  A consent form shall be available if any visitor is to submit to a strip search or body cavity search.  Staff shall conduct all searches pursuant to CPP 9.8.

4.  A visitor shall not be permitted to possess a communication or recording device as defined in CPP 3.20.

5.  A copy of the institution's visiting policies and procedures shall be made available to the visitor.

6.  The visiting room staff shall not accept an article, food, or gift of any kind from an inmate or visitor.

7.  All institutions shall post a copy of KRS 520.050 and 520.060 that prohibit contraband and cite the criminal penalty for violations.

J.  General Dress Code

Each institution shall require a dress code for visitors and inmates.

1.  The dress code shall define the type of clothing allowed.

2.  Clothing shall be in good taste.

| Policy Number | Effective Date | Page |
|---|---|---|
| 16.1 | February 1, 2013 | 8 |

K.    Penalty for Violation of Visiting Procedures

1.    A violation of the visiting procedures or laws may result in visiting restrictions or disciplinary action against the inmate.

2.    Criminal prosecution may be initiated against the visitor, the inmate, or both in case of a criminal violation.

3.    A visitor may be restricted for a specific period of time or permanently for violation of institutional policies and procedures or violations of law.

4.    An individual involved in the following rule violations shall not be approved as a visitor or have visiting privileges reinstated:

a.    smuggling or attempting to smuggle dangerous contraband into an institution;

b.    assisting or aiding in the planning of an escape or attempted escape; or

c.    an employee or volunteer who developed a relationship with an inmate that was unrelated to correctional activities.

Revised: 3/2005

Attachment 1<br>CPP 16.1

## DEPARTMENT OF CORRECTIONS
## VISITING INFORMATION FORM

The inmate below has requested to add your name to his/her approved visiting list.  Please complete this form and return it to the address below.  Please be reminded that falsification of any of the information may result in denial of visiting privileges.

**Inmate Information:**

Name _____ Number _____

Institution _____

Inmate Signature _____ Date _____

**Visitor Information:**

Name _____

Address _____

City _____ State_____ Zip Code_____

Telephone No. _____ Date of Birth _____

Social Security No. _____ Sex:  M _____ F _____ Race _____

Relationship to inmate _____

Are you an:                                                          If yes, date of release

      Ex-offender                        Yes/No            _____

      Parolee or Probationer            Yes/No            _____

      Former Dept. of Corrections Employee   Yes/No     _____

Visitor Signature _____ Date _____

Return to: _____

             _____

**Or phone this information to**: _____

*********************************************************************************
**To be filled in by CTO**

On PSI_____   Not On PSI_____

Comments: _____

CTO Signature_____ Date _____